UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                          :
UNITED STATES OF AMERICA                  :          **09 Cr. 323 (RPP)**
                                          :
          -against-                       :
                                          :
ANDREI VOUSTIANIOUK,                      :
                                          :
                          Defendant.      :
                                          :
-------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANDREI VOUSTIANIOUK'S PRETRIAL MOTIONS

Kerry A. Lawrence (KL 0530)
BRICCETTI, CALHOUN & LAWRENCE, LLP
81 Main Street, Suite 450
White Plains, NY 10601
(914) 946-5900

*ATTORNEYS FOR DEFENDANT
ANDREI VOUSTIANIOUK*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT I        -        THE SEARCH WARRANT IN THIS CASE
                       WAS NOT SUPPORTED BY PROBABLE
                       CAUSE AND THE ITEMS SEIZED PURSUANT
                       TO IT MUST BE SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.        The Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.        Lack of Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.        The Good Faith Exception Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT II       -        THE ITEMS SEIZED PURSUANT TO THE
                       SEARCH WARRANT MUST BE SUPPRESSED
                       BECAUSE THE FEDERAL AGENTS SEARCHED
                       AND SEIZED EVIDENCE FROM A LOCATION
                       DIFFERENT THAN THAT SPECIFICALLY
                       IDENTIFIED IN THE SEARCH WARRANT AND
                       SUPPORTING AFFIDAVIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.        The Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.        The Warrantless Search of Apartment 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

POINT III      -        DR. VOUSTIANIOUK'S STATEMENTS SHOULD
                       BE SUPPRESSED AS THE FRUIT OF THE POISONOUS
                       TREE AND FOR VIOLATION OF HIS *MIRANDA* RIGHTS . . . . . . . 26

A.        The Statements Were the "Fruit of the Poisonous Tree." . . . . . . . . . . . . . . . . 29

B.        The Statements Were Taken in Violation of *Miranda*. . . . . . . . . . . . . . . . . . 29

i

POINT IV   -   THE COURT SHOULD DIRECT THE GOVERNMENT
TO MAKE CERTAIN PRETRIAL DISCLOSURES . . . . . . . . . . . . . . 32

A.   <u>Witness List</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B.   <u>Exhibit List</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.   <u>Witness Statements and Impeachment Material</u> . . . . . . . . . . . . . . . . . . . . . . . . 34

D.   <u>Rule 404(b) Evidence</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E.   <u>Completeness of Discovery</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

Page

## CASES

Dalia v. United States, 441 U.S. 238 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Giordenello v. United States, 357 U.S. 480 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Jacobs v. City of Chicago, 215 F.3d 758 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 23, 25

Maryland v. Garrison, 480 U.S. 79 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ornelas v. United States, 517 U.S. 690 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973),
    cert. denied, 516 U.S. 1182 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Ali, 68 F.3d 1468 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Battershell, 457 F.3d 1048 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 9, 11

United States v. Bonner, 808 F.2d 864 (1st Cir. 1986),
    cert. denied, 481 U.S. 1006 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Brunette, 256 F.3d 14 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 19

United States v. Butler, 71 F.3d 243 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Campanile, 516 F.2d 288 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Cannone, 528 F.2d 296 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

United States v. Christie, 570 F. Supp.2d 657 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Earls, 2004 WL 350725 at *9 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . 33

United States v. Eng, 971 F.2d 854 (2d Cir. 1992),
    cert. denied, 510 U.S. 1045 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Falkowitz, 214 F. Supp.2d 365 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Falso, 544 F.3d 110 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Genin, 594 F. Supp.2d 412 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . 9, 10, 13, 21

United States v. George, 975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Jasorka, 153 F.3d 58 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 18

United States v. Irving, 452 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

United States v. Leon, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

United States v. Madrid, 302 F. Supp.2d 187 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Martino, 664 F.2d 860 (2d Cir. 1981),
    cert. denied, 458 U.S. 1110 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Moore, 968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Morales, 280 F. Supp.2d 263 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Nachamie, 91 F. Supp.2d 565 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Newton, 369 F.3d 659 (2d Cir.),
    cert. denied, 543 U.S. 947 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Pena, 961 F.2d 333 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Reddy, 190 F. Supp.2d 558 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Rueb, 2001 WL 96177 at *7 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Ruggles, 70 F.3d 262 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Santa, 180 F.3d 20 (2d Cir.),
   cert. denied, 528 U.S. 943 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Santore, 290 F.2d 51 (2d Cir. 1960),
   cert. denied, 345 U.S. 834 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

United States v. Syphers, 426 F.3d 461 (1st Cir. 2005),
   cert. denied, 547 U.S. 1158 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

United States v. Travisano, 724 F.2d 341 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Turkish, 458 F. Supp. 874 (S.D.N.Y. 1978),
   aff'd, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981) . . . . . . . . . . . . 33

United States v. Valentine, 984 F.2d 906 (8th Cir.),
   cert. denied, 510 U.S. 828 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Ventresca, 380 U.S. 102 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Wagner, 989 F.2d 69 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Williams, 69 Fed. Appx. 494 (2d Cir.),
   cert. denied, 540 U.S. 932 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Walczyk v. Rio, 496 F.3d 139 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Weeks v. United States, 232 U.S. 383 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 29

## STATUTES

18 U.S.C. § 2252A(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2252A(a)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2256(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 2256(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

18 U.S.C. § 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Fed. R. Crim. P. 12(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 16(a)(1)(E)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Federal Rules of Evidence, Rule 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

Federal Rules of Evidence, Rule 611(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## MISCELLANEOUS

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

http://en.wikipedia.org/wiki/United_States_Customs_Service . . . . . . . . . . . . . . . . . . . . 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA      :        09 Cr. 323 (RPP)

                                    :

          -against-           :

                                      :

ANDREI VOUSTIANIOUK,         :

                                    :

                  Defendant.    :

------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ANDREI VOUSTIANIOUK'S PRETRIAL MOTIONS

Defendant Andrei Voustianiouk, by his attorneys, Briccetti, Calhoun & Lawrence, LLP,

submits this Memorandum of Law in support of his pretrial motions for an Order:

(1)      suppressing physical evidence seized from defendant's apartment, Fed. R. Crim.

        P. 12(b)(3);

(2)      suppressing defendant's statements, Fed. R. Crim. P. 12(b)(3);

(3)      directing the government to make certain pretrial disclosures, Fed. R. Crim. P. 16;

        and

(4)      for such further relief as the Court may deem just and proper.

## FACTS

Andrei Voustianiouk is charged in a two-count felony information[1] with, respectively,

receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(B) (Count

---

[1] On April 2, 2009, Dr. Voustianiouk waived indictment in this matter, and agreed to be prosecuted by information.

One) and 2252A(a)(5)(B) (Count Two). (Lawrence aff., Exh. A).[2] Dr. Voustianiouk has pleaded not guilty to the information.

On January 22, 2009, after obtaining a search warrant issued by Magistrate Judge Michael H. Dolinger (Lawrence aff., Exh. B), agents of the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), searched the defendant's residence, Apartment 2 at 2424 Cambreleng Avenue, Bronx, New York, and seized several computers, computer hard drives, and computer equipment. The search warrant described the premises to be searched as "2424 Cambreleng Avenue Apt. 1, Bronx, New York 10458."

The search warrant had been issued on January 14, 2009, based on the affidavit of ICE Special Agent Robert Raab. In the affidavit, Raab stated he had been a special agent with ICE and/or its predecessor agency for approximately 12 years and that his duties included the investigation of child pornography cases. He also said he had participated in the execution of numerous search warrants and had seized evidence of child pornography in connection with those search warrants. (Exh. B, ¶¶ 1-2).

The affidavit identified the premises for which the warrant was sought as 2424 Cambreleng Avenue, Apartment 1, and described it as "a ground floor apartment inside a two-story white-shingled house." (Exh. B, ¶ 4). Actually, however, Dr. Voustianiouk's apartment is Apartment 2 and is on the second floor of 2424 Cambreleng Avenue. The agents searched Dr. Voustianiouk's apartment (Apartment 2). They did not search the ground floor apartment (Apartment 1). (Voustianiouk aff., ¶¶ 2, 6).

---

[2] All of the exhibits to which this memorandum refers are attached to the accompanying Affirmation of Kerry A. Lawrence, Esq.

The affidavit is 17 pages in length. Most of it contains "boilerplate" information – i.e., information not specific to Dr. Voustianiouk or the premises to be searched – about the Internet, computers, the use of the Internet and computers for the transmission and storage of child pornography, including peer to peer ("P2P") file sharing, and the methods to be used to search for computerized information. The particular investigation here and the evidence that had been gathered to support probable cause is described in exactly one page, as described below.

According to Agent Raab, on or about July 3, 2008, "German law enforcement" ran searches on a P2P network used to share digital files called "eDonkey2000 Network." German law enforcement – no particular agency or agent is identified – was looking for a file called "Lavi," which was "known to German law enforcement to be a child pornography file." Raab stated that the search revealed that a file "with the identical hash value and content" of the "Lavi" file was being hosted by an Internet user with the IP address 68.198.117.141.[3] (Exh. B, ¶ 8).

According to the affidavit, the "eDonkey2000 Network uses a MD-4 hash value to identify files," and that the "odds of two different files having the same MD-4 hash value are mathematically remote." The affidavit does not describe what "mathematically remote" means. The only explanation of the terms "hash value" or "MD-4 hash value" is Raab's statement that "[t]he hash value is represented as a 32 hexadecimal number." (Exh. B, ¶ 9). The affidavit does not explain what a "32 hexadecimal number" is.

---

[3] The affidavit explains that an IP (Internet Protocol) address is a unique number assigned by an Internet Service Provider to each of its users accessing the Internet, and that the IP address is required for the user to access the Internet. (Exh. B, ¶ 6(a)).

In addition, Agent Raab stated that on or about July 22, 2008, "German law enforcement informed ICE agents that IP address 68.198.117.141 was hosting a known child pornography file." However, the affidavit does not identify this file, as "Lavi" or otherwise. (Exh. B, ¶ 10).

Finally, Agent Raab stated that "the subscriber of IP address 68.198.117.141 at the time the child pornography file was accessed . . . was an individual at 2424 Cambreleng Avenue, Apt. 1, Bronx, New York, 10458." (Exh. B, ¶ 10). The affidavit does not name or otherwise identify this subscriber. Hereinafter, this Memorandum will refer to the subscriber as the "Apartment 1 individual."

Agent Raab's affidavit did not attach the Lavi file for the Magistrate Judge to review. Nor did the affidavit provide any description of what is depicted in the Lavi file, other than to say that the file was "known to German law enforcement to be a child pornography file." The affidavit makes reference to the statutory definitions of "child pornography" and "sexually explicit conduct" (Exh. B, ¶ 5), but it does not identify which of the several categories of "sexually explicit conduct" the file allegedly depicted and does not describe any basis for the conclusion that the file constituted child pornography.

The affidavit also did not say whether Raab personally examined the Lavi file before submitting the warrant application, or whether he was instead relying on what he was told by other agents or "German law enforcement." The affidavit contained no information regarding any particular credentials, qualifications, training or expertise Raab had with respect to the determination of what types of images or materials constitute child pornography. Likewise, the affidavit contained no information regarding any particular credentials, qualifications, training or

expertise these unnamed other agents or German law enforcement had with respect to the determination of what types of images or materials constitute child pornography.

The affidavit also contained no information regarding any communications between the Apartment 1 individual and anyone else regarding that individual's knowledge that the Lavi file was being "hosted" or possessed. For example, there is no reference to any e-mail or other communication (such as an Internet chat) from or to the Apartment 1 individual referring to, describing, transmitting, trading or receiving the file, or making the Lavi file, or any file, available to others. And there was nothing in the affidavit showing his/her interest in child pornography or even showing his/her knowing participation in the eDonkey2000 Network.

Finally, there was no information in the affidavit to explain why it was probable that the Lavi file, or any other child pornography, would still be in the Apartment 1 individual's computer or home in January 2009, which is six months after German law enforcement allegedly determined that IP address 68.198.117.141 was hosting a child pornography file. The affidavit contains no evidence that the Apartment 1 individual was a person interested in child pornography or a person who collected child pornography.

Nevertheless, the search warrant was issued on January 14, 2009, and was executed on January 22, 2009. While the search was in progress, two agents questioned Dr. Voustianiouk. The agents did not provide Dr. Voustianiouk with <u>Miranda</u> warnings prior to this interrogation. Although he was not formally arrested at that time, Dr. Voustianiouk was not free to leave during the interview. The agents were armed, although they did not draw their weapons. They directed Dr. Voustianiouk to keep his hands visible and to take a seat in the kitchen of his apartment.

Agent Raab sat at the kitchen table across from Dr. Voustianiouk, and another agent stood in the entryway to the kitchen, so as to block any exit from the kitchen. At no time did the agents tell Dr. Voustianiouk that he was free to leave. Nor did they give him any opportunity to leave. It was clear to Dr. Voustianiouk that he was not free to leave and, had he attempted to do so, he would have been stopped. (Voustianiouk aff., ¶¶ 2-4). The agent's interview memorandum, a redacted copy of which was provided in discovery (Lawrence Aff., Exhibit C), does not say that Dr. Voustianiouk was not in custody at the time of the interrogation. Nor does it say he was free to leave.

## ARGUMENT

## POINT I

### THE SEARCH WARRANT IN THIS CASE WAS NOT SUPPORTED BY PROBABLE CAUSE AND THE ITEMS SEIZED PURSUANT TO IT MUST BE SUPPRESSED

The Court issued a search warrant on January 14, 2009, authorizing the search of Dr. Voustianiouk's apartment for child pornography and related items. On January 22, 2009, ICE agents executed that warrant and seized a number of items, including the alleged child pornography upon which this prosecution is based. However, because the warrant was not supported by probable cause, and because the "good faith" exception to the exclusionary rule does not apply, the warrant was invalid and the items seized pursuant to it must be suppressed.

A.    The Applicable Standard.

A valid search warrant under the Fourth Amendment must be supported by probable cause.  There must be known facts and circumstances demonstrating a reasonable belief that a crime was committed and that "contraband or evidence of a crime will be found" in the place to be searched.  Ornelas v. United States, 517 U.S. 690, 696 (1996); United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983).  The supporting affidavit must state "particularized facts" that allow the judge to draw the necessary inferences to find probable cause.  Giordenello v. United States, 357 U.S. 480, 485-86 (1958).  There must be sufficient information "presented to the [judge] to allow [the judge] to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."  Illinois v. Gates, 462 U.S. 213, 239 (1983).  The court to which an application for a warrant is presented must not "serve merely as a rubber stamp for the police."  United States v. Ventresca, 380 U.S. 102, 109 (1965).  Rather, the court has to be "neutral and detached" in its assessment of the application's sufficiency.  United States v. Travisano, 724 F.2d at 345.  Otherwise, the Fourth Amendment's guarantee that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation," cannot be realized.

As set forth below, the warrant application here lacks any indicia of probable cause. First, and most importantly, Agent Raab's affidavit neither appends nor provides any description at all of the single digital file – called "Lavi" – allegedly connected to 2424 Cambreleng Avenue, Apartment 1, in the Bronx.  Rather, the affidavit contains the bare conclusion that the file was "known to German law enforcement to be a child pornography file."  Second, the affidavit does not even say whether Agent Raab personally examined the Lavi file, and contains no information

7

about his credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of his fellow ICE agents or the unidentified representatives of "German law enforcement," with respect to the determination of what types of images or materials constitute child pornography. Third, the affidavit contains no evidence whatsoever that the "Apartment 1 individual" – the unnamed alleged subscriber of the IP address which allegedly "hosted" the Lavi file – had any history of transmitting, trading, receiving or possessing the Lavi file or any child pornography, or making such material available to others. And finally, there is no information in the affidavit to explain why it was probable that the Lavi file, or any other child pornography, would be found in the Apartment 1 individual's computer or home in January 2009, which is six months after German law enforcement allegedly determined that IP address 68.198.117.141 was hosting a child pornography file. The affidavit contains no evidence that the Apartment 1 individual – whoever that was – was a person interested in child pornography or a person who collected child pornography.

The search warrant application was wholly inadequate and thus did not justify the issuance of the warrant.


B.      Lack of Probable Cause.

This Court recently held that, in a case in which the determination of probable cause turns on whether particular images linked to a suspect's home or computer contain child pornography, the warrant application that fails to particularize "sexually explicit conduct" under 18 U.S.C. § 2256(8) must either append the images that allegedly constitute child pornography or include a

8

reasonably detailed description of the allegedly proscribed material. United States v. Genin, 594 F. Supp.2d 412 (S.D.N.Y. 2009) (Robinson, J.). In Genin, as in the instant case, the warrant application stated that certain images[4] contained child pornography, without describing which category of child pornography the images fell into. "Child pornography" is defined as "any visual depiction, including any . . . computer or computer-generated image or picture . . . of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8). And "sexually explicit conduct" is defined as "actual or simulated (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A).

The first four of the categories of sexually explicit conduct describe behavior that is "clearly defined and easily recognized." United States v. Genin, 594 F. Supp.2d at 420 (quoting United States v. Jasorka, 153 F.3d 58, 60 (2d Cir. 1998), and citing cases). The fifth category, however – "lascivious exhibition of the genitals or pubic area" – is "'far more subjective and open to interpretation,' due to the use of the ambiguous and imprecise term 'lascivious.'" United States v. Genin, 594 F. Supp.2d at 420 (quoting United States v. Battershell, 457 F.3d 1048, 1051 (9th Cir. 2006)). Accord, United States v. Brunette, 256 F.3d 14, 18 (1st Cir. 2001) ("[T]he identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer.")

---

[4] In Genin, the images were on videotapes and DVDs.

The central defect in this case is that the warrant application – as in Genin – neither appends the alleged child pornography file nor provides any description of what is depicted in the file, and it does not specify which of the five categories of "sexually explicit conduct" is allegedly depicted therein. It merely states that the Lavi file was a "known child pornography file." (Exh. B, ¶ 8). Therefore, there was no way for the magistrate judge to make an independent legal conclusion that the file depicted either the conduct described in the first four categories of "sexually explicit conduct" or lascivious exhibition of the genitals or pubic area. Without seeing the file itself, or at least reviewing a reasonably detailed description of the file, the magistrate judge was in effect being asked to rubber stamp the conclusions of the police. Since "the probable cause determination is a nondelegable judicial duty," United States v. Genin, 594 F. Supp.2d at 421, and since the magistrate judge as a practical matter did not and could not independently make the probable cause determination, the issuance of the warrant here was improper.

United States v. Brunette, a case decided by the First Circuit in 2001, is directly on point. In Brunette, a U.S. Customs Agent – just like Agent Raab in the instant case – did not append any of the allegedly pornographic images to his warrant affidavit, and did not provide any description of the photographs. Instead, "he merely asserted that they met the statutory definition of child pornography." 256 F.3d at 15-17. The court held that probable cause was lacking, and rejected the lower court's reliance on the agent's training and experience in determining that the photographs contained child pornography. United States v. Syphers, 426 F.3d 461 (1st Cir. 2005), cert. denied, 547 U.S. 1158 (2006), is also on point. In that case, the warrant application

did not append images previously seized or describe the physiological features of the persons depicted in those images. The court declined to decide the probable cause issue – instead finding that the good faith exception to the exclusionary rule applied – but stated:

> The best practice is for an applicant seeking a warrant based on images of alleged child pornography to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children. An officer who fails to follow this approach without good reason faces a substantial risk that the application for a warrant will not establish probable cause.[5]

Id. at 467. Accord, United States v. Battershell, 457 F.3d 1048, 1051 (9th Cir. 2006) (conclusory statement that picture depicted young female naked in a bathtub insufficient to establish lascivious exhibition of genitals or pubic area); United States v. Christie, 570 F. Supp.2d 657, 688-89 (D.N.J. 2008) (law enforcement must provide a "factual description of the images").

Similarly, in United States v. Jasorka, then-Chief Judge Sifton in the Eastern District of New York found that an affidavit submitted by a U.S. Customs Agent (like Agent Raab) which stated that certain parcels contained "pornographic photographs of male children displaying a lewd and lascivious exhibition of the genitals and pubic areas" did not establish probable cause. The photographs had not been shown to the magistrate judge and the description of the photographs was not sufficiently detailed to permit a finding that they involved lascivious conduct. 153 F.3d at 59-60. The Second Circuit sidestepped the probable cause issue. Although it did not reverse or even question the district court's finding of no probable cause, it upheld the search based on the good faith exception to the exclusionary rule. Id. at 61. In short, the district court's decision in Jasorka is still good law on the issue of probable cause.

---

[5] The issue in Syphers was more whether the images depicted minors rather than whether they depicted sexually explicit conduct. 426 F.3d at 465.

11

Under the authority of this Court's decision in Genin, and in light of the persuasive reasoning of Brunette, Syphers, Battershell, and the district court in Jasorka, the warrant affidavit here clearly failed to establish probable cause because it neither appended the file claimed to contain child pornography nor provided a reasonably detailed description of what was depicted in the file. Indeed, the warrant application here is actually worse in terms of probable cause than the warrant applications in Jasorka and Brunette. In those cases, the affidavits at least focused on the fifth category of sexually explicit conduct – lascivious exhibition – but failed to establish probable cause because there was no description and no images attached for the magistrate judge to consider and make his or her own judgment. In the instant case, the affidavit does not focus on any particular category – it just labels the file "child pornography" in one grand sweep. Thus, the magistrate judge could not have even known which category was involved, much less why the images constituted child pornography (or, for that matter, who concluded it was child pornography or what were that person's qualifications).[6]

There are additional reasons why this warrant application lacked probable cause. Agent Raab does not say whether he personally examined the Lavi file. Indeed, the allegation that the file was "known to German law enforcement to be a child pornography file" suggests that it was unidentified and unnamed German law enforcement agents who viewed the file, not Raab. Therefore, the affiant who appeared before the magistrate judge would not have been able to answer any questions from the judge as to the basis for his conclusion that the file contained

---

[6] Syphers and Battershell considered state court warrant applications that did not specifically invoke the federal definition of child pornography.

child pornography.  <u>United States v. Genin</u>, 594 F. Supp.2d at 423 n.7.  Moreover, the affidavit contains <u>no</u> information about Raab's credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of the German law enforcement agents, with respect to the determination of what types of images or materials constitute child pornography.  It is bad enough that the affidavit contains the conclusory statement that the file was a "known" child pornography file.  What makes it worse is that the magistrate judge had no basis to conclude that whoever came to that conclusion was qualified to do so.

Further, the affidavit is bereft of any evidence that the "Apartment 1 individual" – the unnamed alleged subscriber of the IP address which allegedly "hosted" the Lavi file –  had any history of transmitting, trading, receiving or possessing the Lavi file or any child pornography, or making such material available to others.  There is no information in the affidavit regarding any communications between the Apartment 1 individual and anyone else regarding that individual's knowledge that the Lavi file was being hosted or possessed.  For example, there is no reference to any e-mail or other communication (such as an Internet chat) from or to the Apartment 1 individual referring to, describing, transmitting, trading or receiving the file, or making the file available to others.  And there is nothing in the affidavit showing his/her interest in child pornography or even showing his/her knowing participation in the eDonkey2000 Network.

Indeed, the affidavit does not even identify the Apartment 1 individual by name.  The affidavit is remarkably uninformative about the Apartment 1 individual or any of his/her activities.

Finally, the warrant affidavit has an insurmountable staleness problem. As part of the probable cause determination, the information contained in the warrant application must be sufficiently close in time to the issuance of the warrant and the search so that probable cause can be said to exist as of the time of the search, not simply as of some time in the past. United States v. Wagner, 989 F.2d 69, 75 (2d Cir. 1993). In other words, where the information is stale, probable cause does not exist. Walczyk v. Rio, 496 F.3d 139, 162 (2d Cir. 2007). While there has been some relaxation of the staleness rule where the affidavit shows a pattern of continuing criminal activity, United States v. Martino, 664 F.2d 860, 867 (2d Cir. 1981), cert. denied, 458 U.S. 1110 (1982), or where possession of child pornography is alleged, United States v. Irving, 452 F.3d 110, 125 (2d Cir. 2006), reviewing courts continue to maintain a temporal requirement as a factor in determining probable cause and to reject information that has become stale.

Here, there is no information in the affidavit to explain why it was probable that the Lavi file, or any other child pornography, would be found in the Apartment 1 individual's home or computer in January 2009, which was more than six months after German law enforcement allegedly determined that IP address 68.198.117.141 was hosting a child pornography file. The affidavit contains no evidence that the Apartment 1 individual was a person interested in child pornography or a person who collected child pornography. He/she had no criminal history relating to child pornography or child sexual abuse. There was no "mail cover" to determine if he/she was receiving mail from child pornographers. There was no surveillance of him/her. There were no e-mails to or from him/her relating to child pornography. He/she had no e-mail

address or screen name (current or otherwise) suggesting an interest in child pornography. He/she was not a member of a child pornography website. And the agents made no attempt to communicate with him/her about the Lavi file or any other alleged child pornography.

Thus, this case differs in important respects from United States v. Irving, in which the Second Circuit approved a search warrant to seize a suspected pedophile's computer in his home. Although the information in the warrant was two or more years old, the defendant was a convicted pedophile, and the agents knew from a civilian witness and other evidence that the defendant had sexually abused boys over a nearly 20-year period and had used his computer to receive child pornography. Thus, the search warrant affidavit provided sufficient information for the magistrate judge to find that "as a pedophile [defendant] would be likely to hoard pornographic images of children in his home for extended periods of time." 452 F.3d at 125. Here, there is absolutely nothing in Agent Raab's affidavit to support a similar finding.[7]

It is frankly hard to imagine a warrant application with less probable cause than this one. The Court should so find. The search of Dr. Voustianiouk's home was therefore unlawful and the exclusionary rule requires that the items seized be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); Weeks v. United States, 232 U.S. 383, 398 (1914).

---

[7] Affidavits typically filed in these cases provide magistrate judges with information about the length of time prohibited images are expected to remain on an individual's computer. Even if Agent Raab believed that the "Lavi" file was likely to still be in the possession of the "Apartment 1 individual," he provided the magistrate judge with no information whatsoever permitting the court to assess that claim, and reach an independent conclusion as to whether the information that was alleged to form the basis for probable cause was stale.

C.    The Good Faith Exception Does Not Apply.

The Supreme Court has held that the exclusionary rule does not apply to evidence seized "in objectively reasonable reliance on" a warrant issued by a detached and neutral magistrate judge, even if the warrant is later determined to be invalid.  United States v. Leon, 468 U.S. 897, 922 (1984); accord, United States v. Falso, 544 F.3d 110 (2d Cir. 2008).  The "good faith" exception, however, does not apply in the following circumstances:

> (1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable.

United States v. Falso, 544 F.3d at 125 (quotations omitted); United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).  In such circumstances, it would not be objectively reasonable to rely upon the legal judgment of the issuing judge.  Importantly, it is the government's burden to demonstrate the objective reasonableness of the agents' reliance on the warrant's issuance. United States v. George, 975 F.2d 72, 77 (2d Cir. 1992).

As detailed in the foregoing section, the indicia of probable cause in the agent's application was so lacking that reliance upon the warrant's issuance was objectively unreasonable.  Or, more precisely, the government cannot carry its burden to show that the agents' reliance was objectively reasonable.  Agent Raab's affidavit neither appends nor provides any description of the Lavi file.  Rather, the affidavit contains the bare conclusion that the file was a "known" child pornography file.

The affidavit does not even say whether Agent Raab personally examined the Lavi file,[8] and contains no information about his credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of "German law enforcement" with respect to the determination of what types of images or materials constitute child pornography. Thus, the magistrate judge could not possibly have known whether the person or persons who decided that the file contained child pornography was or were qualified to do so. Likewise, the affidavit contains no evidence at all that the unnamed Apartment 1 individual communicated with anyone regarding the Lavi file. And there is nothing in the affidavit showing his/her interest in child pornography or his/her knowing participation in the eDonkey 2000 Network.

Finally, the affidavit contains no information upon which the magistrate judge could have concluded that it was probable that the Lavi file or some other alleged child pornography would be found in the Apartment 1 individual's home or computer more than six months after "German law enforcement" accessed the file. The apartment 1 individual is not even named, let alone identified as a pedophile or as someone otherwise likely to hoard child pornography in his/her home or computer.

The evidence of probable cause in this affidavit was nearly nonexistent. The magistrate judge could not possibly have made a neutral and detached assessment of probable cause when so little information as to the Lavi file or as to the Apartment 1 individual was provided. The agents' reliance on the issuance of the warrant was therefore objectively unreasonable.

---

[8] If Agent Raab examined the file, he would have observed that the file was not even named "Lavi," but instead was actually named just number "1," with the file extension ".avi." (Lawrence Aff., ¶ 6). By misstating the name of the file, Raab either did not personally look at the file, or misrepresented the actual name of the file.

It is important to note that in a child pornography case in which probable cause turns on what is depicted in seized images, the requirement that the affiant append the images to the warrant affidavit or provide a reasonably detailed description of what is depicted in the images is not novel, in this Circuit or elsewhere. In United States v. Jasorka – decided more than ten years before the warrant application in this case was submitted to Magistrate Judge Dolinger – the Second Circuit certainly did not approve a warrant application submitted by a U.S. Customs Service agent that failed to append or describe the images, and did not hold that Chief Judge Sifton was wrong in concluding that the magistrate judge "lacked a sufficient basis to conclude that the intercepted materials" contained child pornography. 153 F.3d at 59. Rather, the court skipped over the probable cause issue and went straight to the question of whether the agents acted in good faith. It found good faith because the magistrate judge was not knowingly or recklessly misled and did not abdicate her judicial duty, and because the search warrant itself was not facially deficient. Importantly, the court did not address the question of whether the warrant application was so lacking in indicia of probable cause as to render reliance upon it unreasonable. But the good faith question should not have been reached unless the court concluded that the warrant was invalid. United States v. Leon, 468 U.S. at 922. For some reason, the Second Circuit avoided giving explicit guidance to the lower courts and to law enforcement officials on this issue. But the point is that, although the Second Circuit "saved" the search on good faith grounds, rather than probable cause grounds, no one reading that opinion could conclude that it was acceptable practice to fail to append or provide a detailed description of images said to contain child pornography. The district court's decision to the contrary is still good law.

Moreover, the First Circuit's decision in United States v. Brunette – decided more than seven years before the submission of the warrant application in this case – could not be more on point. First of all, Brunette, like Jasorka, is a Customs case. In Brunette, the agent stated that the images all appeared to be within the statutory definition of child pornography, including photographs of a pre-pubescent boy lasciviously displaying his genitals. 256 F.3d at 15. The court explicitly rejected the argument that it was permissible for the magistrate judge to rely on the training and expertise of the agent, without actually viewing the images or being given a detailed description of what was depicted. Id. at 18. The court then considered the good faith question, and concluded that the state of the law in cases of this sort was unclear at the time of the warrant application. The court also stated: "Having now resolved this point, we would, in the future, view quite differently an agent's choice to withhold photos from a judicial officer." Id. at 20. That pronouncement was made in 2001.

In 2003, the criminal investigative arm of the Customs Service was combined with the investigative arm of the Immigration and Naturalization Service to become ICE, a part of the newly-created Department of Homeland Security.[9] Agent Raab, the affiant in this case, states in his affidavit that he has "been employed as an agent with ICE and/or its predecessor agency for approximately twelve years," that he is assigned to a group within ICE that investigates the "transmission of child pornography," including child pornography transmitted via computer, and that he has "participated in the execution of numerous search warrants, and ha[s] seized evidence of child pornography in connection with those search warrants." (Exh. B, ¶ 1). The agent also

---

[9] See http://en.wikipedia.org/wiki/United_States_Customs_Service.

states that he has "received training in computer crime investigation," and includes a detailed description of how computer technology and the Internet are used for the storage and distribution of child pornography. (Exh. B, ¶ 6).

There is no question that Agent Raab is a veteran agent with long experience investigating computer crimes in general and child pornography cases in particular.[10] His experience as an ICE special agent stretches back to well before the Jasorka and Brunette cases were decided. Presumably, he was an agent for ICE's predecessor agency, the U.S. Customs Service, for six years or so prior to the formation of ICE.[11] Notably, the agents whose affidavits were rejected by Chief Judge Sifton in Jasorka and by the First Circuit in Brunette were both fellow Customs agents. Finally, Agent Raab says he has extensive experience investigating child pornography cases, has received training in cases involving the use of computers, and has participated in the execution of numerous search warrants.

Based on the foregoing, the government cannot plausibly claim that Agent Raab was not on notice of the Jasorka district court ruling, and more particularly the Brunette circuit court ruling, as to what is required for a search warrant affidavit to pass muster, when the probable cause determination is based primarily on whether particular images linked to a suspect's home or computer contain child pornography. If he did receive training in these areas, would not that

---

[10] Although, as mentioned above, the affidavit contains no information regarding any particular credentials, qualifications, training or expertise Raab had with respect to the determination of what types of images or materials constitute child pornography.

[11] Since ICE has only been in existence since 2003, and since Raab says he has been an ICE special agent for 12 years (i.e., since about 1997), it seems likely that he was a Customs Service agent for the first 6 years of his career.

training have included a discussion of what is required to establish probable cause in a child pornography case? If his training did not include that topic, it should have. After all, as this Court observed in <u>Genin</u>, the "oft-repeated principle [here is] that a magistrate's 'action cannot be a mere ratification of the bare conclusions of others,' nor a proverbial 'rubber stamp for conclusions drawn by the police.'" 594 F. Supp.2d at 421 (citations omitted). This is an important principle that would have been central to any training a Customs agent would have received. And the Customs Service (and ICE) had to have been aware of published decisions in which their own warrants in child pornography cases were found to be lacking because they failed to attach the pertinent images or describe them in detail.

The warrant application here not only failed to follow the persuasive and prevailing law that is unmistakable in <u>Jasorka</u> and <u>Brunette</u> (as well as <u>Syphers</u> and <u>Battershell</u>), it actually goes in the opposite direction in presenting to the magistrate judge an affidavit that is less informative and descriptive than the affidavits in those cases. What does this show? It shows at best a lackadaisical attitude and at worst indifference to the extraordinarily important constitutional requirement that "no Warrants shall issue, but upon probable cause." The government came nowhere close to establishing probable cause for the issuance of the warrant in this case and to carrying its burden to show good faith. As a result, the items seized must be suppressed.

**POINT II**

**THE ITEMS SEIZED PURSUANT TO THE SEARCH WARRANT
MUST BE SUPPRESSED BECAUSE THE FEDERAL AGENTS
SEARCHED AND SEIZED EVIDENCE FROM A LOCATION
DIFFERENT THAN THAT SPECIFICALLY IDENTIFIED IN
THE SEARCH WARRANT AND SUPPORTING AFFIDAVIT**

The Court issued a search warrant on January 14, 2009, for 2424 Cambreleng Avenue,

Apartment 1, Bronx, New York. On January 22, 2009, Agent Raab and fellow federal agents

conducted a warrantless search of Apartment 2 at 2424 Cambreleng Avenue, Bronx, New York –

– which is the defendant's apartment. Because the agents searched a location different than that

identified in the search warrant, the items seized in Apartment 2 must be suppressed.


A.      The Applicable Standard.

Partial mis-descriptions in search warrants of places to be searched do not make searches

predicated on such warrants invalid so long as the "possibility of actual error is eliminated by

other information, whether it be a detailed physical description in the warrant itself, supplemental

information from an appended affidavit, or knowledge of the executing agent described from

personal surveillance of the location to be searched." United States v. Valentine, 984 F.2d 906,

908-09 (8th Cir.), cert. denied, 510 U.S. 828 (1993) (upholding search of unnumbered building

that executing agents had observed for several days prior to applying for warrant, although

warrant mistakenly identified building to which it was attached); United States v. Bonner, 808

F.2d 864, 866-67 (1st Cir. 1986), cert. denied, 481 U.S. 1006 (1987) (upholding search despite

"technical omission" in warrant, because the "agents, having previously conducted the

surveillance, knew exactly which house they wanted to search"); United States v. Williams, 69 Fed. Appx. 494, 496 (2d Cir.), cert. denied, 540 U.S. 932 (2003) (warrant upheld despite "technical error," such as incorrect address, when possibility of actual error eliminated by other information, such as familiarity with apartment because officers had purchased drugs from confidential informant shortly before warrant was executed).

Where executing agents discover that a search warrant as issued does not permit a search of the specific location they seek to search, absent exigent circumstances, it is incumbent on the agent to refrain from searching that location until a new or amended warrant is obtained. Maryland v. Garrison, 480 U.S. 79, 85-87 (1987) (officers required to discontinue search once put on notice that there was risk that unit erroneously included in warrant; must judge constitutionality of their conduct in light of information available to them at time they acted).

If agents are on notice of a dual occupancy nature of a dwelling before executing a warrant, the failure to retreat and obtain a new warrant once the agents desired to search a different location makes the warrantless search of the new location unlawful. United States v. Santore, 290 F.2d 51, 67 (2d Cir. 1960), cert. denied, 345 U.S. 834 (1961); United States v. Campanile, 516 F.2d 288, 291 (2d Cir. 1975).

Probable cause to search one apartment in a multi-unit building does not support a warrant authorizing a search of the entire building. Jacobs v. City of Chicago, 215 F.3d 758, 767-69 (7th Cir. 2000). "When a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." Id., quoting United States v. Butler, 71 F.3d 243, 248 (7th Cir. 1995).

B.    The Warrantless Search of Apartment 2.

In the present case, Agent Raab alleged in his affidavit in support of search warrant that the subscriber of the IP address at the time the alleged child pornography file was accessed was an individual at 2424 Cambreleng Avenue, Apt. 1, Bronx, New York. (Lawrence Aff., Exh. B, ¶ 9). If Agent Raab knew the name of this "individual" at the time he applied for the search warrant, he did not disclose this fact to the Magistrate Judge.[12]

Agent Raab informed the Magistrate Judge that he had "personally observed the area near and around the Premises." (Exh. B, ¶ 4). Agent Raab further identified the Premises as "a ground floor apartment inside a two-story white shingled house. The building has stairs leading up the front door and is attached on both sides." (Exh. B, ¶ 4). Agent Raab sought in his affidavit a search warrant for Apartment 1.

Agent Raab's description of Apartment 1 was in fact correct, as far as it went. As reflected in the affidavit of defendant Dr. Voustianiouk, there is a separate ground floor apartment at the location that is Apartment 1. However, that apartment is not his, and was not the one searched. (Voustianiouk Aff., ¶ 6). Attached to Dr. Voustianiouk's affidavit are photographs of the exterior of 2424 Cambreleng Avenue, as well as the front doors to Apartment 1 on the first floor, and his apartment, Apartment 2, on the second floor. (See Photograph Exhibits to the Voustianiouk affidavit).

---

[12] In the criminal complaint filed in this case after Dr. Voustianiouk's arrest, Agent Raab specifically mentioned that the IP address was assigned to Andrei Voustianiouk and, further, that a Postal Agent with the Postal Service stated that mail had been received at the Premises by Andrei Voustianiouk. It is unclear whether this information was known to Agent Raab at the time he applied for or executed the search warrant, or if this information was learned between the date the search was conducted (January 22, 2009), and the date the Complaint was filed (February 10, 2009).

When Dr. Voustianiouk opened the front door of the house, Agent Raab and others entered the front door, and Dr. Voustianiouk started walking up the stairs to his apartment. (Photograph of the stairway is attached to Voustianiouk affidavit as the fourth photograph). At that time Agent Raab was well aware of the fact that the court-authorized search warrant did not authorize the search of the upstairs apartment, but, rather, only the apartment on the ground floor, Apartment 1.

As established by the cases cited supra, having specifically sought a warrant to search only Apartment 1, and knowing full well based on his personal observation before applying for the warrant that the dwelling had separate and individualized apartments, it was incumbent on Agent Raab once he decided to search Apartment 2 to not conduct the search before securing an amended warrant from the court authorizing the search of Apartment 2, Dr. Voustianiouk's apartment. See Maryland v. Garrison, 480 U.S. at 87; United States v. Santore, 290 F.2d at 67; Jacobs v. City of Chicago, 215 F.3d at 767-69.

The issue here, unlike the probable cause issue discussed above, does not concern the validity of the warrant itself, and no claim is being made that the warrant issued was a "general warrant" authorizing an overbroad sweeping search of the entire building. See Maryland v. Garrison, 480 U.S. at 84. The Fourth Amendment requires a warrant to "particularly describe the place to be searched." U.S. Const. amend. IV. The warrant at issue here does "particularly describe the place to be searched" – Apartment 1. The issue here is whether the execution of the warrant in searching a wholly separate, and identified apartment that was not described in the warrant, was reasonable. Maryland v. Garrison, 480 U.S. at 87; Dalia v. United States, 441 U.S. 238, 258 (1979).

The facts of the present case, unlike those of the cases addressed above, did not support any legitimate lawful basis for the federal agents to conclude that the upstairs apartment was either the repository of illegal material or covered by the search warrant. The only prior surveillance conducted of the premises established the fact that Apartment 1 was the ground floor apartment. The affidavit recited not a single fact mentioning Dr. Voustianiouk by name, or tying Apartment 2 to the IP address which was the subject of the warrant. Significantly, the agents did not even bother to search Apartment 1, the only apartment described in the warrant, or to obtain an amended warrant for Apartment 2.

Once inside the building, and learning that Dr. Voustianiouk was unarmed and that no lawful basis existed to search Apartment 2, the agents' failure to secure a warrant for the actual premises searched compels the conclusion that all of the materials seized in Apartment 2 be suppressed, as well as the fruits of that search, including, but not limited to, Dr. Voustianiouk's statements made to Agent Raab.


## POINT III

### DR. VOUSTIANIOUK'S STATEMENTS SHOULD BE SUPPRESSED AS THE FRUIT OF THE POISONOUS TREE AND FOR VIOLATION OF HIS *MIRANDA* RIGHTS

In its April 8, 2009, discovery letter, the government made disclosure of a redacted agent's memorandum which summarized statements Dr. Voustianiouk allegedly made during the interrogation conducted at his home on January 22, 2009. (Lawrence Aff., Exh. C). The memorandum summarizes statements Dr. Voustianiouk allegedly made relating to his Internet viewing of child pornography. (Exh. C).

The facts regarding Dr. Voustianiouk's interview are set forth in his accompanying affidavit: On Thursday, January 22, 2009, sometime between 6:00 a.m. and 7:00 a.m., he was awakened by the sound of his door buzzer, as well as the other door buzzers in the house. He exited his apartment, Apartment 2 (the second floor apartment) at 2424 Cambreleng Avenue, Bronx, New York, and walked downstairs. He opened the front door of the building and several federal agents entered the front door and came into the hallway. The agents showed him their badges and identified themselves as being from Homeland Security. The agents were armed, although they did not have their weapons drawn. They directed him to go into his apartment and to keep his hands visible. He walked upstairs and entered his apartment and was directed to take a seat on a chair in his kitchen. One federal agent, whom he later learned to be Agent Robert Raab, sat at the table across from him and another agent stood in the entryway to the kitchen, blocking any exit from the kitchen. (Voustianiouk aff., ¶ 2).

Dr. Voustianiouk was asked if he had any weapons and said no, other than some kitchen knives and a canister of mace. The agents examined the knives and mace. He was dressed in his bathrobe and asked for permission to wash his face. As he attempted to leave the kitchen to go to the bathroom to wash his face he was directed to remain in the kitchen and use the kitchen sink to wash his face. He was asked for his name and date of birth and country of citizenship and to confirm that he resided in the apartment. He was then advised that the agents were there with a search warrant to search his apartment. They did not show him the warrant at that time or disclose the fact that the search warrant they possessed was for a different apartment in the two-family house, Apartment 1 on the ground floor. Other armed agents entered the apartment and

went into his bedroom and shut the door behind them.  At no time was he ever asked for permission to search his apartment.  At no time did he consent to the search of his apartment.  (Voustianiouk aff., ¶ 3).

Agent Raab and the second agent questioned Dr. Voustianiouk while he was in the kitchen.  The other agents searched his apartment while he was being questioned.   The questioning continued for what he believed to be in excess of one hour.  At no time did the agents tell him that he had a right to remain silent, that anything he said could be used against him in court, that he had a right to consult with an attorney and to have that attorney present during questioning, and that if he could not afford an attorney one would be provided at no cost to represent him.  At no time did the agents tell him that he was free to leave.  Nor did they ever give him an opportunity to leave.  It was quite clear to him that he was not free to leave and, had he attempted to get up and leave, he would have been stopped.  (Voustianiouk aff., ¶ 4).

The search of Dr. Voustianiouk's apartment was concluded and the agents left after providing him with a copy of the search warrant and an inventory of the items seized.  (Voustianiouk aff., ¶ 5).

The statements Dr. Voustianiouk made to the agents during the search of his home must be suppressed on two grounds: (1) the statements were the "fruit of the poisonous tree"; and (2) the statements were the product of custodial interrogation and the agents failed to provide the familiar Miranda warnings.

A.    The Statements Were the "Fruit of the Poisonous Tree."

Where there has been an illegal search and seizure, the exclusionary rule bars the introduction of statements derived or resulting therefrom.  Wong Sun v. United States, 371 U.S. 471, 484-87 (1963); United States v. Pena, 961 F.2d 333, 338 (2d Cir. 1992), see also United States v. Santa, 180 F.3d 20, 25 (2d Cir.), cert. denied, 528 U.S. 943 (1999); United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992), cert. denied, 510 U.S. 1045 (1994).  The question is whether "the evidence . . . has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. at 488.

Here, all the statements Dr. Voustianiouk made to the agents – from the moment they arrived at his front door – were the fruit of the illegally obtained and executed search warrant. The agents came to Dr. Voustianiouk's home for the purpose of executing the search warrant, not because they wanted to interview Dr. Voustianiouk.  The agents conducted the interrogation of Dr. Voustianiouk simultaneously with the illegal search.  Thus, had the agents not obtained the defective warrant and conducted the illegal search, Dr. Voustianiouk would not have made the statements he now seeks to suppress.  Under Wong Sun, those statements must all be suppressed.


B.    The Statements Were Taken in Violation of *Miranda*.

Under Miranda v. Arizona, 384 U.S. 436, 467-73 (1966), any statement stemming from the custodial interrogation of a suspect is presumed involuntary and thus inadmissible unless the following warnings are given: that the suspect has a constitutional right to remain silent, that

anything he says can and will be used against him, that he has a right to confer with an attorney and to have the attorney present during any questioning, and that if he cannot afford an attorney one will be appointed for him.

Here, there is no question that Dr. Voustianiouk was questioned and that no <u>Miranda</u> warnings were given. Thus, the only question is whether Dr. Voustianiouk was in custody at the time of the interrogation.

The Second Circuit has recently held that the "test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" <u>United States v. Newton</u>, 369 F.3d 659, 671 (2d Cir.), <u>cert. denied</u>, 543 U.S. 947 (2004) (quoting <u>United States v. Ali</u>, 68 F.3d 1468, 1472 (2d Cir. 1995)). In making that determination, a court must consider "'the totality of all the surrounding circumstances.'" <u>United States v. Ruggles</u>, 70 F.3d 262, 264-65 (2d Cir. 1995) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)), <u>cert. denied</u>, 516 U.S. 1182 (1996).

In <u>Newton</u>, the court explained that the custody analysis must begin "by asking whether a reasonable person would have thought he was free to leave." If the answer is no, the court must next determine "whether a reasonable person would have understood his <u>freedom of action</u> to have been <u>curtailed</u> to a degree associated with a formal arrest." 369 F.3d at 672 (emphasis added).

Moreover, the "focus is on the facts known to the seized suspect and whether a reasonable person would have understood his situation was comparable to a formal arrest." Id. at 675. In other words, what the agents "understood" is irrelevant to the inquiry, and the fact that the agents had not made a formal arrest is also irrelevant to the inquiry. The only thing that matters is whether a reasonable person in the shoes of the suspect understood that "his situation" was "comparable" to a formal arrest. Presumably, a reasonable person is one who applies common sense to an assessment of "his situation."

Dr. Voustianiouk reasonably and sensibly believed he was not free to leave for the following reasons: Several armed law enforcement officers were in his apartment executing a search warrant. He was told to remain seated in the kitchen with at least two agents with him most of the time. He was not allowed to leave the kitchen even to wash his face. At no time did the agents tell him he was free to leave, and they did not give him an opportunity to leave. The agents were positioned so as to block his access to the entryway leading out of the kitchen.

Applying the principles of Newton to these facts, there is no question that Dr. Voustianiouk was in custody when he was being interrogated by the ICE agents. Would a reasonable person in Dr. Voustianiouk's position have thought he was free to leave? No way. Was his freedom of action curtailed to a degree associated with a formal arrest? Absolutely. There was nothing unreasonable about the extent to which Dr. Voustianiouk was restrained. But the reasonableness of the restraint is irrelevant to this inquiry. United States v. Newton, 369 F.3d at 673. What matters is whether a reasonable person would have thought he was free to leave the police encounter. No reasonable person would have thought that. And what also

matters is whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with a formal arrest. No reasonable person would have thought otherwise.

Accordingly, Dr. Voustianiouk was in custody when he was questioned by the ICE agents. Dr. Voustianiouk was not given the familiar <u>Miranda</u> warnings. The statements he made must be suppressed.


## POINT IV

### THE COURT SHOULD DIRECT THE GOVERNMENT TO MAKE CERTAIN PRETRIAL DISCLOSURES

The defense cannot adequately prepare for trial unless the government produces a witness list, an exhibit list, witness statements and impeachment material, and a detailed description of any Rule 404(b) evidence it intends to offer. These items are all "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(I). Moreover, all of these requests are calculated to facilitate the orderly presentation of evidence and avoid unnecessary delays at trial. In addition, the government should be directed to certify when it has completed its discovery disclosures.


A.    <u>Witness List</u>.

This Court clearly has the discretion to order the government to produce a witness list. <u>United States v. Cannone</u>, 528 F.2d 296, 299 (2d Cir. 1975). Some of the factors the courts have considered in determining whether to exercise this discretion are (i) whether the indictment charges only non-violent offenses and the defendant does not have a criminal record involving

crimes of violence, (ii) whether the trial will largely involve testimony relating to documents, (iii) whether production of the witnesses' names will not likely lead to the witnesses' failure to appear at trial, and (iv) whether the indictment alleges offenses occurring over an extended period of time. United States v. Turkish, 458 F. Supp. 874, 881 (S.D.N.Y. 1978), aff'd, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981); accord, United States v. Cannone, 528 F.2d at 300; United States v. Earls, 2004 WL 350725, at *9 (S.D.N.Y. 2004); United States v. Falkowitz, 214 F. Supp.2d 365, 395 (S.D.N.Y. 2002); United States v. Rueb, 2001 WL 96177, at *7 (S.D.N.Y. 2001).

Most of these factors argue in favor of requiring a witness list here. Moreover, it would be no burden on the government to identify its witnesses before trial, and it would serve only to "level the playing field" in this case, not give some sort of improper advantage to the defense.

As in United States v. Falkowitz, supra, the Court should direct the government to provide a witness list thirty days before trial.

B.      Exhibit List.

Moreover, the Court can and should order the government to identify its trial exhibits well in advance of trial. United States v. Earls, 2004 WL 350725 at *9; United States v. Falkowitz, 214 F. Supp.2d at 391; United States v. Turkish, 458 F. Supp. at 881. The Court should direct the government to provide an exhibit list before trial that identifies the exhibits by description and Bates-number (or, if there is no Bates-number, by some other identifying characteristic).

C.     <u>Witness Statements and Impeachment Material</u>.

As to witness statements and impeachment material (<u>Jencks</u>, 18 U.S.C. § 3500, <u>Giglio</u>), it is understood that the Court cannot <u>compel</u> the government to make production of <u>Jencks</u>/3500 material prior to trial. However, the Court does have "the authority to determine, as a matter of sound case management, when the Government shall disclose <u>Brady</u> and <u>Giglio</u> material." <u>United States v. Morales</u>, 280 F. Supp.2d 263, 275 (S.D.N.Y. 2002). <u>Accord</u>, <u>United States v. Madrid</u>, 302 F. Supp.2d 187, 193 (S.D.N.Y. 2003). Typically, <u>Giglio</u> material is inextricably intertwined with <u>Jencks</u>/3500 material. Moreover, under Rule 611(a) the Federal Rules of Evidence, the Court has wide discretion over the mode and order of proof at trial. This is relevant here because in the event the defendant has insufficient time to read, digest, and follow-up on the <u>Jencks</u> and <u>Giglio</u> material for particular witnesses prior to their testimony at trial, the Court would have the authority to delay cross-examination of these witnesses, or direct that they be re-called at a later date.

Under the circumstances of this case, if witness statements and impeachment material are not provided substantially before trial, the defense will <u>not</u>, at least with respect to some of the witnesses, have sufficient time to read, digest, and follow-up on the material before cross-examining those witnesses. In that event, the defense may have no choice but to move pursuant to Rule 611 either to continue the testimony of government witnesses or to re-call them. If, on the other hand, the witness statements and impeachment material are provided well before trial, no such motion should be necessary.

D.   Rule 404(b) Evidence.

As to Rule 404(b) (similar act) evidence, the government is required to "provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial." That notice period should be at least thirty days, if not more. United States v. Reddy, 190 F. Supp.2d 558, 576-77 (S.D.N.Y. 2002) (government conceded that thirty days notice was reasonable; court ordered forty-five days notice); United States v. Nachamie, 91 F. Supp.2d 565, 577 (S.D.N.Y. 2000) (one month notice ordered). In fact, the government should be directed to provide such notice as soon as it determines what 404(b) evidence, if any, it will seek to introduce, but not later than 45 days before trial, in case the defense needs to investigate such evidence.

E.   Completeness of Discovery.

Finally, the Court should direct the government to confirm when discovery is complete. Too often, discovery is provided much later than Rule 16 contemplates, and frequently continues up to and during trial. Such belated disclosure clearly compromises the defendant's right to a fair trial and to adequate time and notice in order to prepare his defense. Further, the government knows when additional material is expected. It is not too much to require the government to confirm that all such material is in hand and all discovery has been made before the case is deemed ready for trial.

## CONCLUSION

For all the foregoing reasons, defendant Andrei Voustianiouk's pretrial motions should be granted.

Dated: White Plains, NY
      May 22, 2009

                                BRICCETTI, CALHOUN & LAWRENCE, LLP

By:   *Kerry A. Lawrence*

                  Kerry A. Lawrence (KL 0530)
                  81 Main Street, Suite 450
                  White Plains, NY 10601
                  (914) 946-5900

                  *ATTORNEYS FOR DEFENDANT*
                  *ANDREI VOUSTIANIOUK*

To:     Janis M. Echenberg, Esq.
       Assistant United States Attorney
       One St. Andrew's Plaza
       New York, New York 10007